on the calendar, which is 20-1390CB, Fabrique Innovations, Inc. v. Federal Insurance Company. So I believe that for the appellant, we have Mr. Silverberg. Yes, Your Honor. Very good, Mr. Silverberg. I understand you have 10 minutes of which you have reserved two for rebuttal. Is that right? That's correct, Your Honor. Very good. Excuse me, Judge Nardini. I'm sorry. This is Maria. I just want to confirm the audio for Judge Sinatra's working. I saw him moving his lips, and I think he was trying to ask a question. Can you hear me now? I tried in the previous argument twice, but I never got through. So how about now? Yes, I can hear you now. And I'm sorry, Judge Sinatra, do you want to go back? No, we don't need to. Thank you. I'm sorry. Sorry about that. Okay, so Mr. Silverberg, why don't you begin for the appellant? Thank you. If it may please the Court, thank you, Your Honors. The starting point for this case is it was a coverage dispute under a first-party property insurance contract. In deciding a coverage dispute like this, one needs to look at this in the policy itself. So what we have here, the question, the main issue here is what constitutes merchandise in transit under the policy? What triggers that coverage? There's no dispute in this case that it must be one of two things, either an intra-company shipment of goods for which the insured, in this case, the plaintiff, Fabrique, agreed in writing prior to the damage to provide insurance. It is undisputed that with the exception of 5 to 10 percent of the goods stored at the third-party warehouse, Hancock, that the remaining goods were not subject to a writing to insure the goods. That is undisputed. Thus, the remaining 90 to 95 percent of the goods only qualify for coverage if there is an intra-company transfer. Below, Judge Daniels determined that this did constitute an intra-company transfer, and simply the direct plain meaning of the term intra-company does not work. Hancock was a third-party warehouse where Fabrique and the plaintiff paid to store its goods. What about the endorsement, Mr. Silverberg? Doesn't the endorsement that your client issued that adds the Baldwin, Mississippi location, you know, don't we have to read the endorsement together with the policy? It's part of the policy. And then how do you address the intra-company situation then when you've got another location in Mississippi that the insured is paying for coverage for? Yes, so it absolutely does. It lists that warehouse. That does not make it an intra-company transfer. In order to keep goods there, they needed to list it on the endorsement. That does not then convert, Your Honor, an intra-company transfer between two different companies with an intra-company transfer, which would be between the same company. There's no question that Hancock was a third-party warehouse. No question. And it's not illusory coverage. All Fabrique had to do was agree in writing to provide insurance. The fact that it listed a third-party warehouse does not convert it into an intra-company transfer. Can I just ask you if we had a situation that was not quite as tangled as the one here, where they talk about, you know, consignments and there's a couple different arrangements, but if Fabrique, put aside Hancock, Fabrique decided that they wanted to store their fabric in a warehouse, but they didn't want to get in the real estate business, and they just leased the warehouse, and they shipped everything to the warehouse. You know, they had their name on the outside of the warehouse and everything, but they didn't have title to it. They were paying rent. Are you suggesting that that would not be an intra-company transfer? No, I would suggest that if I understand Your Honor's question, I would suggest that that is an intra-company transfer. You don't have to own the building, but if you're operating it, if you're leasing it, whether it's a 10-year lease, a 50-year lease, or a 2-year lease, if you're operating the warehouse, that's an intra-company transfer, and, frankly, that's not unusual in the world of manufacturing. There are manufacturers who own and operate a warehouse. There are manufacturers who lease an entire warehouse, and then there are manufacturers who use third-party warehouses, and there are manufacturers who use a combination of the above. So you're saying that in any situation where you have a third party operating the warehouse as well, that is not an intra-company transfer? Yes, Your Honor, but I would also add here that I believe the facts will show that it was not just fabric goods that were in this warehouse. This was a warehouse available to others and was being used by others, and, in fact, the record will show that Fabrique was paying money to Hancock, a third party, a completely independent third party, to store its goods in that warehouse. So it was absolutely an inter-company transfer, not an intra-company transfer. If I may, just to spin another hypothetical, and you can tell me why you don't think it's analogous. If I were to rent a safe deposit box at my local bank, and the bank runs the safe deposit room. They control who can come, what are the hours and all that, and I, as a company, put all of my gold bullion into the drawer of that safe deposit box. Am I engaging in an inter-company transfer because the bank is the one that runs that safe deposit room? You know, I don't like to duck any questions, particularly when it's coming from a Second Circuit judge. Tell me why that hypothetical is not analogous to your situation. So I struggle with it a little bit because I don't know the underlying contractual agreement for the safe deposit box, what it says about ownership or occupancy of the safe deposit box. Is it sort of like a condominium type of situation where you sort of own the four walls of the safe deposit box? But this is clearly a situation where it truly is an inter-company and a third party situation. So that is why I think it may be different, but I don't know enough of the facts, and I don't have enough gold bullion to take the safe deposit box, so that's why I can't answer that question further. Well, it does sound like it's inter-company until you, in my mind at least, until you spend more time with the endorsement. And I'm still here stuck on page A119 of the record, which is the storage endorsement. And here, you know, it's not just listing Baldwin, Mississippi. And why would you list Baldwin, Mississippi where you're putting your property if you didn't think you were getting coverage there? But the last two entries on that endorsement contemplate storage location that you own, lease, or operate, and storage location that you don't own, lease, or operate. So it really just contemplates that the insured is going to have another storage location somewhere else that its property is going to reside at. And I think that the problem here in my mind is how do I read that together with the rest of the policy and the inter-company, intra-company dynamic? So, yes, Your Honor, thank you for asking that question. That is a good question. So certainly that location is listed, and there's a recognition that there very well could be, and there is some coverage there provided it was pursuant to a written agreement. So, yes, the insurance company wants to know where the product is being stored and know where the locations are, but that does not, Your Honor, convert it into an intra-company transfer. The coverage here is not illusory at all, and I think to some extent that's what the question gets to. If it was an intra-company, if it was a warehouse that was owned and operated, owned and or operated, whether it's leased or owned, by Fabrique, then that's intra-company. This is clearly by plain meaning definition intra-company. The fact that it's listed on the endorsement that, yes, goods may be stored here, doesn't convert it into intra-company. If, however, Fabrique simply entered into a written agreement with Hancock to get insurance for all of its product there, it would have had insurance. This would not have been an issue but for the dishonesty and misconduct exclusion. What Fabrique did is it entered into a written agreement for 5% to 10% of the product to get insurance and not the other 90% to 95% of the product. That's the rub before we even get to the dishonesty or willful misrepresentation. For some reason, I don't see my clock here. Mr. Silverberg, we've kept you a minute past your initial allocation of eight minutes. You've set aside two minutes for rebuttal. If you wish, you may use some of it now or you can hold it in reserve for rebuttal. What's your preference? I will hold it in reserve, Your Honors. Thank you. Okay. Thank you. Let's hear from your opposing counsel for the appellee. I want to make sure I'm pronouncing it right. Is it Blasvern? That's correct, Your Honor. That was just a lucky try on my part. Mr. Blasvern, you have 10 minutes. Why don't we hear from you for the appellee? Thank you. May it please the court. Josh Blasvern, Hoagy, Newman, Riegel, and Kenney for the appellee, Fabrique Innovations, Inc. Judge Daniels got this right. He properly held that the goods satisfied the definition of merchandise in transit. He properly held that neither of the exclusions raised by federal applied, and he properly held that Fabrique was entitled to the reimbursement of all charges it incurred, attempting to avert and minimize the loss. On each of these points, regardless of who bears the burden, the record overwhelmingly supports Fabrique. Federal can't point to any facts to show the goods weren't covered under the storage endorsement. Judge Daniels correctly held that all of the goods at the Hancock warehouse were covered under the endorsement, and indeed the evidence in the record shows that both parties understood that. Nor can federal point to any facts that show that Hancock engaged in dishonesty or willful conduct when it sold the goods with advance notice to Fabrique and with the express permission of the Bankruptcy Court. And federal can't point to any facts showing that any of the sue and labor expenses were not reasonably incurred to avert or minimize Fabrique's loss or enforce Fabrique's rights. I have to confess I found it odd that Mr. Silverberg said that this intracompany shipments argument was federal's main argument when it's something that did not appear in this case until after Judge Daniels had already ruled on liability. They raised it at the damages phase as a last-ditch, desperate effort to avoid coverage. I think Judge Daniels and our papers make very clear why the goods fit within the definition of intracompany transfer, but putting that aside, and I think Judge Sinatra got to this, this endorsement is intended quite clearly to cover the goods. Now, Glenn Dubac was the underwriter. First of all, they had insured Fabrique before this, and Fabrique never had some written agreement where they agreed to arrange for insurance. And Mr. Dubac also testified that he knew that Fabrique never owned any of these distribution centers that were listed in these policies. They insured all of the goods at these locations, irrespective of whether Fabrique owned any of them and irrespective of whether they had entered into some written agreement to arrange insurance. He testified on page 623 of the appendix. My opinion is that we were covering those goods at the warehouse period, also on that page. My intent was to cover goods in storage. That's what my intent is. Every time I write an ocean cargo policy and I'm covering warehouse storage, I'm covering the type of goods that they're saying that they're storing there while in coverage. Same page. He's asked, what did you understand with respect to the Hancock facility? He said, quote, I was covering $1,250,000 of stock, Fabrique stock. And that's, of course, what the storage endorsement itself says, covers $1.25 million worth of goods at the Hancock warehouse. It's on page 119 of the appendix. And the premium paid by Fabrique reflected that the full $1.25 million worth of goods were stored at the Hancock warehouse. The premium is addressed at page A64. Mr. Silverberg argues that. The previous quote that you had of the representative of the insurance company was at what page of the appendix? I'm sorry, Your Honor. I didn't quite hear you. Your quote that you gave me, you gave a little a minute ago about the, in effect, the admission of coverage. What page is that? That's all on page 623 of the appendix. And what I quoted for were from pages 101, 103, and 104 from Mr. Duback's testimony. Okay. And, you know, as to Mr. Silverberg's argument that this was, that, well, I think what I've just said addresses Mr. Silverberg's argument about this not being illusory. Yes, there was a possibility that Fabrique could go out and meet one of these ocean marine cargo requirements that would trigger coverage here. But the fact is that the intent clearly, there's undisputed fact that the parties had this mutual intent for this to be covered. And in addition to that, it clearly satisfies the definition of intercompany shipments. So, I mean, we've got this covered seven ways from Sunday. Let's talk about the exclusions for a moment, if you wouldn't mind. Why don't we have a triable issue of fact on whether the exclusions apply? I mean, we can sit here and define what dishonest acts means and what willful misconduct means. We can give you definitions as a matter of law. But the facts seem to me to be going in both directions on whether there is a dishonest act here or whether there's a willful misconduct here. So why don't we have a tribal issue on that issue? Your Honor, because both parties stipulated that it wasn't a tribal issue of fact. Judge Daniels asked Mr. Silverberg whether there were any tribal issues of fact on that, on the exclusions. And he said no, as did my colleague, Mr. Born. And I would say that there are no issues of fact. They had ample opportunity to develop such issues. They never sought to depose anyone at Hancock, for example. They did nothing to develop the record. I'm sorry. Just following up on Judge Sinatra's question, can you give us specific citation to the record where the parties so stipulated? Your Honor, I believe it is not in the appendix. I believe that it is docket number 60. Perhaps my colleague, also Mr. Silverberg, Steve Silverberg, could check that, and I could provide that to you on the record. I believe it's docket number 60 from the underlying docket. Well, what you can do is if he can pass you that before your time is up, that's fine. Otherwise, you could follow up with a brief letter following argument just with the record section. Absolutely, Your Honor. And obviously, your opposing counsel would have the opportunity to submit a quick one-page response to that. Certainly. Look, the parties agreed, and we will provide documentation of this. The parties agreed that there were no tribal issues of fact. Subsequently, federal disputed issues of fact with respect to damages. But on the exclusions, there were no issues of fact. And frankly, all the facts on the record support our position. And I have to point out that in Federal's denial letter, they noted that Hancock had asserted a superior interest in the goods. I have that cited somewhere. That's page 582 of the appendix. And as I mentioned, they never deposed anyone in Hancock to develop some support for their position that Hancock had some hidden motive or some hidden belief that it did not possess the superior interest. Hancock filed an adversary proceeding against Fabrique. Fabrique obviously took a different position and believes that Hancock did not – there was no merit to Hancock's position. But yet the case settled without any finding. But there's nothing suggesting that Hancock acted deceitfully or fraudulently or acted with, you know, torches intent, with intent to damage Fabrique. I mean, they were acting in their economic – repeated characterizations of this Hancock activity as a theft. Your position is it's not a judicial admission, but is it nothing? Does it count at all for anything? Respectfully, it counts for nothing, I would say. It's an irate business person colloquially using the word theft to describe – you know, he could just as simply call federal thieves for not paying out on this claim, candidly. You know, he's a CEO who felt like he got ripped off, and he's calling it a theft. But there's certainly no judgment of that. I believe Your Honor was right to use the word characterization. That's certainly how Judge Daniels took it. But there's nothing past that. That's all they have, Your Honor. I have 30 seconds left. I would just like to say that, again, on the sue and labor, we believe we're entitled to 100 cents on the dollar because, again, we made our prima facie showing that all of this was reasonably incurred in averting or minimizing the loss and – or to enforce Fabrique's rights as to Hancock. And federal did absolutely nothing to rebut that in any way. They never deposed anyone at Hancock. They never deposed anyone at Herrick Feinstein. They did nothing. Thank you, Your Honors. Thank you, Mr. Blasser. Let's go back to Mr. Silverberg. And you have reserved two minutes, so we'll put two minutes on the clock. And why don't we hear your rebuttal? Thank you, Your Honors. First of all, with respect to the testimony of the underwriter, Mr. Duback, which is cited in our reply brief and also found in the record at A621 through 623, he did not acknowledge or in any way state that all of the property in the warehouse was covered simply because the warehouse was listed. It didn't convert it from an intercompany transfer to intracompany. He specifically said, and this is in our reply brief and in the record, again, I guess it goes back to what their agreement was with the warehouse. And this goes back to, again, the policy itself. It's insured if it's pursuant to a written contract. In this particular instance, according to Fabrique, it was only 5 to 10 percent of the goods. Also, I would just add that the law is clear on this. In this circuit and virtually in most other circuits, certainly in this circuit, you don't look to intrinsic evidence when the policy on its face is clear. I didn't get an opportunity during my initial opening argument to speak to the dishonest acts and willful misconduct. With respect to whether or not this is a fact issue, it is a judicial admission and judicial admission of facts. While counsel says that the plaintiffs could have said that federal engagement, this is what the facts are. Fabrique stated in its notice of claim to my client that this was a theft. Fabrique stated in the complaint that there was a theft of goods, A13 of the record. And then the principal plaintiff, Simon Garfunkel, doubled down. He testified at his deposition that Hancock had stolen the goods. Now, let's look at the claim against Hancock by Fabrique in the Bankruptcy Court Act. Again, these are allegations in the complaint. And I quote, Hancock sold the merchandise for Hancock's benefit without informing Fabrique and without Fabrique's knowledge. That's A13 of the record. That's a factual statement. And that is willful misconduct under the law. And we cite the cases in our reply. So these are fact out. These are factual allegations that certainly support why this was why these exclusions apply to the entirety of the loss. Again, intra company, it is plain meaning in the in the dictionary. The policy uses the term intra company. And this was an intra company transfer. It was not intra company. There was no way, shape or form that you can turn Hancock part of Fabrique. Those are the facts, your honors. I did not get a chance to deal with the labor issues. Again, I think it's worth noting that the way they did it, the way Fabrique did it. They spent five hundred fifty fifty thousand dollars in legal fees and they credit Chubb seventy thousand dollars for that because they decided to essentially make up a number of three million dollars in consequential damage. And they award themselves to us. Also, why did Hancock pay two hundred fifty thousand dollars if it didn't engage in dishonest and willful misconduct? Thank you. Thank you to both the parties. Again, very helpful oral arguments today and we very much appreciate your honor. I have the slates. Oh, yeah. Why don't you give that to us right now? If you've got it, I can just so it's page forty one lines, 13 through 19 from ECF number 60. And I'll just if I may, I can just read these three lines from that. You know, we've got this. If you gave us the citation, we've got the record close at hand. Thank thank you very much. We very much appreciate from both of you. We have two other cases on the calendar today that are on submission. So let me just end by thanking all of the litigants for your patience with the zoom format. And let me also thank the clerk's office and the I.T. staff of the court, who, as usual, have done a wonderful job in keeping us all together and all online. So with that, I would ask Ms. Rodriguez to please. Would you please wrap us up here?